Jessica Thompson, (*pro hac vice*)
Stephanie Verdoia, (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 268-9370
E-mail: jessicat@hbsslaw.com
E-mail: stephaniev@hbsslaw.com

Cecilia N. Brennan, Esq. (SBN 243954)
HKM EMPLOYMENT ATTORNEYS LLP
401 West A Street, Suite 200 (#77)
San Diego, California 92101
Tel/Fax: (619) 717-6410
E-mail: cbrennan@hkm.com

*Attorneys for Plaintiff*
DONALD K. SHRUHAN, JR. an individual

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| DONALD K. SHRUHAN, JR. an individual, | Case No. 5:22-cv-05498-EJD |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| v. | |
| APPLE INC., a Delaware corporation, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   JURISDICTION AND VENUE ............................................................................4

III.  PARTIES ...............................................................................................................4

IV.   FACTUAL ALLEGATIONS ................................................................................5

     A.    Donald K. Shruhan, Jr. is an exemplary Apple employee............................5

     B.    Donald K. Shruhan, Jr. received zero Restricted Stock Units in spite of excellent performance in 2019..................................................................7

     C.    Apple confirmed that it declined to award any RSUs or a merit increase because RSUs are designed as an investment in the future. ....................8

     D.    Apple confirmed that it declined to award RSUs for an impermissible age-based reason. ............................................................................................9

     E.    Apple retaliated against Plaintiff after he submitted protected complaints..............11

V.    CAUSES OF ACTION..........................................................................................12

FIRST CAUSE OF ACTION  AGE DISCRIMINATION IN VIOLATION OF FEHA.................12

SECOND CAUSE OF ACTION  FAILURE TO PREVENT DISCRIMINATION .......................13

THIRD CAUSE OF ACTION  RETALIATION IN VIOLATION OF FEHA ..............................14

FOURTH CAUSE OF ACTION  RETALIATION IN VIOLATION OF CALIFORNIA LABOR CODE ........................................................................................................15

FIFTH CAUSE OF ACTION  BREACH OF CONTRACT..........................................................16

SIXTH CAUSE OF ACTION  VIOLATIONS OF THE UNFAIR BUSINESS PRACTICES ACT18

PRAYER FOR RELIEF ...............................................................................................18

DEMAND FOR JURY TRIAL ....................................................................................20

# I.     INTRODUCTION[1]

1.     Ageism is a stubborn paradox of the modern workplace—highly trained, talented, ambitious workers are shunted to the margins based on ageist stereotypes that they are slowing down, are not innovative, or are likely to retire soon. These biases persist even though older workers take fewer sick days,[2] have better problem-solving skills,[3] are *more* innovative,[4] and are more likely than younger workers to be highly satisfied in their work.[5]

2.     Federal and state legislatures have passed antidiscrimination laws after decades of hard-fought advocacy and civil rights leadership. These laws exist to protect all California workers. And private lawsuits like this one are one of their most important enforcement mechanisms.

3.     But while California's laws continue to evolve to meet the modern challenges of age bias and discrimination, the data repeatedly show that antidiscrimination laws are not working as intended. In 2018, the Equal Employment Opportunity Commission issued a special report on age discrimination against older Americans. It concluded that even though 50 years had passed since Congress outlawed the practice, "age discrimination remains a significant and costly problem for workers, their families and our economy."[6] Victoria Lipnic, the EEOC's acting chair at the time,

---

[1] Pursuant to the Court's Standing Order for Civil Cases, a red-line document showing the changes made to the previously filed complaint is attached hereto as Exhibit A.

[2] Stephen Miller, *Misconceptions About Age and Work Absence Challenged*, SHRM (Jan. 23, 2014), https://www.shrm.org/resourcesandtools/hr-topics/benefits/pages/age-absence-misconceptions.aspx

[3] Fredda Blanchard-Fields et al, *Age Differences in Everyday Problem-Solving Effectiveness: Older Adults Select More Effective Strategies for Interpersonal Problems*, THE JOURNALS OF GERONTOLOGY: SERIES B, Volume 62, Issue 1, January 2007, Pages P61–P64, https://doi.org/10.1093/geronb/62.1.P61.

[4] Benjamin F. Jones, *Age and Great Invention*, Working Paper 11359, NAT. BUREAU OF ECONOMIC RESEARCH (May 2005), http://www.nber.org/papers/w11359.

[5] Frances Burks, *What Is the Relationship Between Job Satisfaction & Age?*, CHRON, https://smallbusiness.chron.com/relationship-between-job-satisfaction-age-12618.html (last visited Nov. 16, 2022).

[6] *The State of Age Discrimination and Older Workers in the U.S. 50 Years After the Age Discrimination in Employment Act (ADEA)*, EEOC NEWSROOM (June 2018), https://www.eeoc.gov/reports/state-age-discrimination-and-older-workers-us-50-years-after-age-discrimination-employment.

SECOND AMENDED COMPLAINT - 1
Case No.: 5:22-cv-05498-EJD
003317-11/2359282 V2

went further: "Like harassment, everyone knows it happens every day to workers in all kinds of jobs, but few speak up. It's an open secret."[7]

4.    Also in 2018, a ProPublica and Urban Institute study found that **more than half** of older U.S. workers were pushed out of longtime jobs before they choose to retire, suffering irreversible financial damage.[8] The analysis showed that only one in 10 of these workers ever again earned as much as they did before their employment setbacks. Even years afterward, the household incomes of over half of those who experienced such work disruptions remained substantially below those of workers who do not. "This isn't how most people think they're going to finish out their work lives," said Richard Johnson, the Urban Institute economist who worked on the analysis. "For the majority of older Americans, working after 50 is considerably riskier and more turbulent than we previously thought."

5.    And the problem is worsening: Nearly 80% of older workers now say they've seen or experienced age discrimination in the workplace, according to the 2021 survey by AARP.[9] That was the highest share since the group began asking the question in 2003.

6.    California's tech industry has grown up (and thrived) under California's progressive antidiscrimination statutory regime. And yet the industry is repeatedly one of the worst offenders when it comes to age bias. Facebook CEO Mark Zuckerberg famously declared in 2007 that "Young people are just smarter."[10] In 2019, Google agreed to pay $11 million to settle the claims of more than 200 job applicants who said they were discriminated against because of their age.[11]

---

[7] *EEOC Acting Chair Lipnic Releases Report on The State Of Older Workers And Age Discrimination 50 Years After The ADEA*, EEOC NEWSROOM (June 26, 2018), https://www.eeoc.gov/newsroom/eeoc-acting-chair-lipnic-releases-report-state-older-workers-and-age-discrimination-50.

[8] Peter Gosselin, *If You're Over 50, Chances Are the Decision to Leave a Job Won't be Yours,* PRO PUBLICA, (Dec. 28, 2018), https://www.propublica.org/article/older-workers-united-states-pushed-out-of-work-forced-retirement.

[9] Rebecca Perron, *Age Discrimination Continues to Hold Older Workers Back*, AARP RESEARCH, (May 2021), https://www.aarp.org/research/topics/economics/info-2021/older-workers-new-skills-covid-19-pandemic.html.

[10] Margaret Kane, *Say what? 'Young people are just smarter'*, CNET (March 28, 2017) https://www.cnet.com/culture/say-what-young-people-are-just-smarter/.

[11] Kathy Gurchiek, *Google Ends Age-Discrimination Suit with $11 Million Settlement*, SHRM (July 24, 2019), https://www.shrm.org/resourcesandtools/hr-topics/behavioral-competencies/global-

7.      In 2020, an EEOC investigation into IBM "uncovered top-down messaging from (IBM's) highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for" younger ones.[12] One IBM executive referred to older workers as "dinobabies" and stated his intent to "accelerate change by inviting the 'dinobabies' (new species) to leave."[13]

8.      Silicon valley, in particular, is obsessed with youth.[14] A 2015 Payscale survey found that while the median U.S. worker is 42, at Silicon Valley companies, the median employee is more likely to be 31 (Apple), 30 (Google, Tesla), 29 (Facebook, LinkedIn), or younger.[15] And in a survey of US startup founders polled by venture-capital firm First Round Capital, 37% said **age is the strongest investor bias against founders**, while 28% cited gender and 26% cited race. Founders participating in First Round's survey said ageism in tech starts, on average, at the age of 46—and more than a quarter of the founders said the bias affects entrepreneurs as young as 36.[16]

9.      Here, Plaintiff—a 67-year-old seasoned Apple employee—has been a victim of this deeply-rooted Silicon Valley ageism at the hands of Apple.

_____

and-cultural-effectiveness/pages/google-ends-age-discrimination-suit-with-11-million-settlement.aspx.

[12] Peter Gosselin, *The U.S. Equal Employment Opportunity Commission Confirms a Pattern of Age Discrimination at IBM*, PRO PUBLICA, (Sept. 11, 2020) https://www.propublica.org/article/the-u-s-equal-employment-opportunity-commission-confirms-a-pattern-of-age-discrimination-at-ibm.

[13] *Lohnn v. IBM*, 1:21-cv-06379-LJL, Plaintiff's Motion for Summary Judgment, Dkt. No. 58 (S.D.N.Y. Feb. 11, 2022).

[14] Noam Scheiber, *The brutal ageism of tech: meet Silicon Valley's obsolete workforce*, THE NEW STATESMAN (UK EDITION) (Mar. 24, 2014), https://www.newstatesman.com/science-tech/2014/03/brutal-ageism-tech ("[I]t has fallen to Matarasso [a cosmetic surgeon] to make older workers look like they still belong at the office. 'It's really morphed into, 'Hey I'm forty years old and I have to get in front of a board of fresh-faced kids. I can't look like I have a wife and two-point-five kinds and a mortgage.'"") *See also*, Jon Swartz, *Silicon Valley's not-so-secret bias: Ageism*, USA TODAY (Sept. 15, 2016), https://www.usatoday.com/story/tech/columnist/2016/09/15/silicon-valleys-not-so-secret-bias-ageism/90120616/; Lydia Dishman, *Is Ageism In Tech An Under-The-Radar Diversity Issue?* FAST COMPANY (Dec. 10, 2015), https://www.fastcompany.com/3054204/is-ageism-in-tech-an-under-the-radar-diversity-issue.

[15] Carol Hymowitz and Robert Burnson, *It's Tough Being Over 40 in Silicon Valley,* BLOOMBERG (Sept. 8, 2016) https://www.bloomberg.com/news/articles/2016-09-08/silicon-valley-s-job-hungry-say-we-re-not-to-old-for-this.

[16] Leah Fessler, *Startup founders say age bias is rampant in tech by age 36,* QUARTZ (Jan. 5, 2019), https://qz.com/work/1514739/startup-leaders-say-age-bias-is-rampant-against-founders-as-young-as-36/.

## II.    JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a)(1) because Plaintiff is of diverse citizenship from Defendant and the amount in

controversy exceeds $175,000.

11.    This Court has personal jurisdiction over Defendant Apple Inc. because its principal

place of business is in California and it has conducted and continues to conduct business in

California.

12.    Venue is proper in this District under 28 U.S.C. § 1391 because the events that gave

rise to the claims occurred in substantial part in this District and because Apple Inc. resides in this

judicial district for venue purposes.

13.    On or about September 22, 2022 the California Department of Fair Employment and

Housing ("DFEH") provided Plaintiff with a right-to-sue letter for his age discrimination claims.

14.    On or about November 15, 2022, the California Department of Fair Employment and

Housing ("DFEH") provided Plaintiff with a right-to-sue letter for his retaliation claims.

Accordingly, this action has been filed within all applicable statutory time periods.

## III.    PARTIES

15.    Plaintiff Donald K. Shruhan, Jr. ("Plaintiff" and/or "Mr. Shruhan") is an individual

who at all times relevant to the allegations made in this Complaint was domiciled in Pima County,

Arizona.

16.    Plaintiff is informed and believes that Defendant Apple Inc. ("Defendant" and/or

"Apple") is, and at all times herein mentioned was, a Delaware corporation qualified to and doing

business within the State of California, having its principal place of business either at One Infinite

Loop, Cupertino, CA or at One Apple Park Way, Cupertino, CA 95014.

17.    At all times herein, Defendant was and is an employer under the meaning of

Government Code § 12926(d). Defendant has over 5 employees.

# IV.     FACTUAL ALLEGATIONS

A.     **Donald K. Shruhan, Jr. is an exemplary Apple employee.**

18.     Plaintiff commenced employment with Apple in 2008, and recently retired from the role of Individual Contributor 6 in Apple's Intellectual Property Enforcement unit. He came to Apple in 2008 with decades of investigative experience at the U.S. Customs Service/U.S. Homeland Security Investigations and Pfizer Inc. When he negotiated his employment contract with Apple, Plaintiff sought and received the maximum grant of Stock Options and Restricted Stock Units during several rounds of negotiations. Apple thus knew that the stock portion of Plaintiff's compensation was a highly material benefit of the bargain.

19.     Plaintiff's executed employment agreement stated that "Your employment will be governed by and interpreted under the laws of the State of California, without regard to conflict of law principles."

20.     Plaintiff was Apple's first Senior Director for Global Security in the Asia-Pacific ("APAC") region, where he developed investigative programs to combat security leaks, mass production security leaks, fraud and major theft in the region. Plaintiff's International Assignment Agreement ("expat package") stated: "you shall be an employee of Apple Inc., under the terms of your Offer Letter dated February 26, 2008."

21.     Plaintiff split his time as Senior Director between the Global Security and the Intellectual Property Enforcement (IP Enforcement) teams while he was based in the APAC region. The leadership for both Global Security and IP Enforcement were stationed in Apple's Cupertino headquarters, including Plaintiff's direct supervisors. In IP Enforcement, Plaintiff managed all enforcement activities relating to counterfeiting in the region. As one of Plaintiff's supervisors Tom Moyer ("Mr. Moyer") described in Plaintiff's 2018 review, the APAC region is "one of Apple's most important and challenging regions," and Plaintiff was successfully leading it. At all relevant times, Mr. Moyer was based in Apple's Cupertino headquarters.

22.     Plaintiff's supervisor noted that that the IP Enforcement APAC team had "some of our biggest ever successes in FY18 thank[s] to Don. . . ."

23.    Plaintiff's performance is likewise unequivocally positive as evidenced by feedback from supervisors and peers reflected in his reviews from 2017-2021. Plaintiff "achieved" or "exceeded" expectations for each yearly review from both supervisors. Below are some excerpts from these yearly reviews:

- "Don's network and experience is irreplaceable." (2017 year-end review)

- ". . . I find Don to be the singularly most focused investigator we have on our staff." (2018 year-end review)

- "As always, Don brings unmatched expertise and resourcefulness in getting things done throughout APAC, the US and internationally, along with a tireless work ethic and a collaborative, enthusiastic nature." (2018 year-end review)

- "Don continues to be Apple's point expert for regional fraud." (2019 year-end review)

- "He has the single largest portfolio of APAC legal contacts in Asia - perhaps in the security industry." (2019 year-end review)

- "IP Enforcement APAC has had some of our biggest ever successes in FY19 in APAC and globally thanks to Don. . . ." (2019 year-end review)

24.    Based on Apple's Fiscal Year 2019 Manager Compensation Guidelines, each year Apple employees receive a "Refresh" grant of Restricted Stock Units ("RSUs"). These grants are given to "retain key employees" in lead positions. Apple's pattern and practice is to award RSUs to its employees that is tied to their performance ratings. Each year, Apple HR issues a bracket for managers to guide their determination of RSU awards based on performance, with higher performers to be awarded RSUs at the higher end of the bracket, and lower performers at the lower end, etc. The minimum Refresh grant between fiscal years 2019 and 2022, per Apple's Fiscal Year 2019 Manager Compensation Guidelines, was $7,000.

25.    Other than in 2019, Plaintiff received RSU awards consistent with this policy and practice. As a measure of this excellence, Plaintiff has been awarded RSUs along with these reviews in every year except 2019. Plaintiff's direct supervisors emphasized the importance of retaining him when awarding RSUs.

26.     Apple notified Plaintiff in 2018 that it would not renew his expat package, and therefore he would be leaving the APAC region by 2020. Apple's decision not to renew Mr. Shruhan's expat package was made at its Cupertino headquarters. Once Plaintiff's supervisor on the IP Enforcement team learned that Apple was not renewing this package, he approached Plaintiff and asked if he would consider working exclusively for the IP Enforcement team. Plaintiff told his supervisor that he would consider the move on the conditions that he would: be permitted to work from Arizona; be at least a Director-level employee; and have a global role as a mentor to the IP Enforcement team.

27.     Plaintiff's IP Enforcement supervisor was thrilled that Plaintiff would consider taking this new role, and notified Apple's Vice President & Chief IP Counsel, who worked with Human Resources to begin the transition process.

28.     Plaintiff and Apple ultimately reached an agreement for Plaintiff to return to the United States following the expiration of his expat package. Plaintiff agreed to continue his employment for Apple only if he remained at least a Director-level employee at Director-level compensation. On information and belief, this agreement was memorialized in written communications between Plaintiff's supervisors to Apple HR.

29.     By the time Plaintiff left the APAC region in 2020, he had personally developed best-in-class programs in Global Security and IP enforcement. According to Mr. Moyer, Plaintiff had saved Apple hundreds of millions of dollars during this period.

**B.     Donald K. Shruhan, Jr. received zero Restricted Stock Units in spite of excellent performance in 2019.**

30.     On September 26, 2019, Mr. Moyer gave Plaintiff one of his many excellent reviews. However, by the end of the review he informed Plaintiff that the Company was not awarding him RSUs. Plaintiff is unaware of any other Senior Director who met or exceeded expectations but did not receive any RSUs. He was 64 years old at the time. On information and belief, Mr. Moyer made and executed this decision from Apple headquarters in Cupertino, California.

31.     The minimum Refresh RSU grant per Apple's Fiscal Year 2019 Manager Compensation guidelines was $7,000. Apple thus violated its Fiscal Year 2019 Manager Compensation Guidelines by failing to award any RSUs to Mr. Shruhan.

32.     The two other Senior Directors in Plaintiff's organization, Legal Global Security, received RSUs commensurate with their performance. Each was significantly younger than Plaintiff.

33.     In the two preceding fiscal years when Plaintiff received similar excellent reviews, he was granted RSUs valued at $850,000 and $800,000 respectively. The total number of shares that he should have received in 2019 was between 14,977 and 14,097 shares at $56.75/share, with a value at the time of between $850,000 and $800,000.

**C.     Apple confirmed that it declined to award any RSUs or a merit increase because RSUs are designed as an investment in the future.**

34.     Between September and December of 2019, Plaintiff attempted to resolve the matter with his immediate supervisor (Mr. Moyer) and Apple's Human Resources ("HR") department, both located at Apple's Cupertino, California headquarters. Mr. Moyer confirmed that Apple failed to award any RSUs because RSUs are designed as an investment in the future and a retention hook. Mr. Moyer's statement implied that because of Plaintiff's age, Mr. Moyer (1) no longer saw him as part of Apple's future, and (2) no longer saw the need to incentivize Plaintiff's continued employment with Apple because he was nearing retirement age.

35.     On December 11, 2019, Plaintiff brought this matter to the attention of Kate Adams, Apple's General Counsel, who is located at Apple's Cupertino, California headquarters. Ms. Adams informed Plaintiff that he should try to work it out with HR, but to follow up with her if he couldn't resolve it.

36.     Plaintiff then contacted HR at Apple's Cupertino, California headquarters[17] and was told that the RSUs were withheld because there was a "clawback" policy regarding RSUs. This policy was developed and implemented by Apple personnel in Cupertino, California. HR representatives claimed that they performed a detailed "clawback" analysis and compensation review

---

[17] Plaintiff was in Cupertino, California when this conversation took place. Plaintiff spoke with Marian Holmes, who was located in Sacramento, California at that time.

that they "coincidently" found that Plaintiff was entitled to zero RSUs. Plaintiff asked for a copy of the "clawback" policy and was told that there was no written policy. He has also asked for a copy of the compensation review multiple times, but to-date has not been provided any documentation supporting this review.

37.    HR failed to provide any written policy at the time or any calculations reflecting the claimed "compensation review" showing that the discrepancy in compensation for 2019 was exactly equivalent to the full value of the RSUs (thus justifying Mr. Moyer's representations regarding Apple's refusal to award RSUs).

38.    Apple HR's attempted reliance on this policy is a post-hoc, pretextual reason for Apple's failure to award RSUs—a reason that Apple later abandoned when attempting to justify Apple's discriminatory ageist decision.

39.    Plaintiff continued to discuss the matter with his direct supervisors throughout 2020 and 2021.

**D.    Apple confirmed that it declined to award RSUs for an impermissible age-based reason.**

40.    In September of 2021, Plaintiff was asked to submit an email indicating his plan for retirement. At that time, he had never notified Apple of his intention to retire. He declined Apple's request to provide a date certain for his retirement.

41.    Soon after, Plaintiff also learned that Apple HR was seeking his demotion to Individual Contributor 6.

42.    Later that same month, after another excellent performance review in FY 2021, Plaintiff was advised that his RSU award would again be diminished and he would also not be receiving the merit pay increase to his salary that was awarded uniformly to Apple's U.S. employees.

43.    On or around October 2021, Plaintiff filed a formal Employee Relations ("ER") complaint alleging illegal age discrimination. Apple's ER is located in Cupertino, California. Plaintiff explained that in FY2019, as a Senior Director, he received an excellent performance review yet was not awarded any RSUs, nor did he receive a merit increase. Plaintiff reported that it was the first time in 11 years that his stock award was not commensurate with his professional achievement.

44.     During a February 2022 call with Employee Relations at the conclusion of the investigation, which was directed from Cupertino, California. Apple's ER specifically represented to Plaintiff that he was not awarded any RSUs in 2019 because Tom Moyer thought he was retiring. This was a discriminatory age-based assumption on the decision-maker's part, with no basis in fact.

45.     At the time he made this decision, Mr. Moyer knew that Plaintiff was negotiating a transition, not his retirement. Mr. Moyer reviewed and signed Plaintiff's 2019 review which stated, in part, that his co-workers and supervisors looked forward to continuing to work with him in 2020. Plaintiff's goals as noted in his 2019 review were to "Transition security work as part of his departure from the role in 2020."

46.     When Plaintiff asked Apple's internal investigator if she conducted interviews with Apple's Cupertino, California-based Vice President & Chief IP Counsel (a fact witness with first-hand knowledge of Plaintiff's intentions and Mr. Moyer's awareness of his intentions), she confirmed she failed to do so.

47.     In a follow-up call with Apple Employee Relations,[18] Plaintiff asked why Apple's justification had changed—*i.e.*, why was there was no reference on any "clawback" policy as a justification for this decision. Employee Relations could not answer this question, but did provide an undated copy of a clawback policy titled "RSU Adjustment Policy." This policy provided that "RSUs cannot be adjusted without the Compensation Committee's prior approval and without the employee's signed agreement in the adjustment letter." Apple never sought or obtained the Plaintiff's agreement to adjust his RSUs.

48.     It does not appear that Apple made any effort to comply with the procedure and justifications for the RSU Adjustment Policy—which requires a signed agreement by the employee—in connection with its 2019 decision to award zero RSUs to Plaintiff. Nor does the RSU Adjustment Policy apply by its own terms to an initial award of RSUs as opposed to the return of any

---

[18] Present on this call was Adelmise Roseme Warner, Apple's head of ER, who was calling from Apple's Cupertino, California headquarters.

RSUs following a grant. The Apple personnel responsible for promulgating and administering the RSU Adjustment Policy are located at Apple's headquarters in Cupertino, California.

49.     On or around February 23, 2022, after he exhausted all efforts with Apple HR and ER, Plaintiff again contacted Ms. Adams to discuss this issue. He did not receive a response.

**E.     Apple retaliated against Plaintiff after he submitted protected complaints.**

50.     On June 17, 2022, Plaintiff informed Apple of his intent to litigate his age discrimination claims should they fail to reach a resolution. In response to Plaintiff lodging such protected complaints, Defendant did nothing to repair or mitigate these issues, instead, Defendant reduced his overall compensation and demoted him in retaliation for such complaints.

51.     In one final attempt to resolve this issue short of litigation, Plaintiff requested a mediation with Apple counsel, which took place on September 6, 2022. The parties did not make progress. And so, regrettably, Plaintiff had no choice but to file this Complaint.

52.     Shortly after the parties' unsuccessful mediation, Mr. Shruhan learned that while Apple's US employees received a merit pay increase of 7.5% in 2022, Plaintiff would not receive any merit pay increase in 2022, despite another excellent performance review from his immediate supervisor(s). Plaintiff also learned that Apple HR was threatening to demote him from Director to Individual Contributor 6.

53.     On November 19, 2022, three days after he filed his First Amended Complaint, Apple demoted Plaintiff to Individual Contributor 6.

54.     Demotion constitutes adverse action under California law prohibiting retaliation because such an act would deter a reasonable person from reporting discriminatory conduct. Apple's threat to demote Plaintiff here was accompanied by Apple's failure to award a 7.5% increase in merit pay that was awarded uniformly to Apple's other U.S. employees. Apple's failure to award merit pay increases and its demotion of him caused his total compensation to fall below that of a standard U.S. Director-level Apple employee.  Accordingly, Apple has taken adverse action against Plaintiff after he submitted protected complaints.

# V.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### AGE DISCRIMINATION IN VIOLATION OF FEHA

55.    Plaintiff hereby re-alleges and incorporates herein by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

56.    At all times herein mentioned, the Fair Employment and Housing Act Government Code § 12940 *et seq*. ("FEHA") was in full force and effect and was binding against Apple.

57.    Plaintiff was an employee of Apple within the meaning of FEHA.

58.    Apple was at all material times an employer within the meaning of FEHA and as such, barred from discrimination in employment decisions on the basis of age.

59.    Apple and its agents discriminated against Plaintiff on the basis of age in violation of FEHA, Government Code § 12940(a), and Article I of the California Constitution by engaging in the course of conduct more fully set forth in the Factual Allegations above and including, without limitation, failing to award RSUs commensurate with performance and the desire to retain Plaintiff, demoting him based on Plaintiff's advanced age and a discriminatory assumption that he would soon retire, and failing to award him a merit-pay increase to his salary, also based on Plaintiff's advanced age and a discriminatory assumption that he would soon retire.

60.    The discriminatory practices as alleged in the Factual Allegations were approved and ratified by the Company's management in Cupertino, California, including Tom Moyer and Debbie Rice due to their failure to take action following Plaintiff's repeated complaints outlining with specificity that he had been the victim of age discrimination.

61.    As a direct and proximate result of the Company and its agents' age discrimination against Plaintiff, Plaintiff has suffered: (a) humiliation, serious mental anguish and emotional and physical distress; and (b) loss of past and future earnings and employment benefits and opportunities; all on account of which Plaintiff is entitled to compensatory damages in an amount according to proof.

62.    Plaintiff has also incurred, and will continue to incur, necessary and reasonable attorney's fees and costs in order to enforce his rights, which he is entitled to recover under FEHA.

63.     In doing the acts alleged herein, Defendants acted maliciously and oppressively, with the wrongful intent of injuring Plaintiff, and acted with an improper and evil motive amounting to malice, in conscious disregard of Plaintiff's rights. Because the acts taken toward Plaintiff were carried out by Defendants acting in a despicable, deliberate, and intentional manner, Plaintiff is entitled to recover punitive damages in an amount according to proof at trial.

<div align="center">

**SECOND CAUSE OF ACTION**

**FAILURE TO PREVENT DISCRIMINATION**

</div>

64.     Plaintiff hereby re-alleges and incorporates herein by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

65.     Under FEHA, it is unlawful for an employer to fail to take all reasonable steps necessary to prevent discrimination from occurring. Cal. Gov. Code § 12940(k).

66.     Although on notice, Defendant, in violation of Cal. Gov. Code § 12940(k), failed to take reasonable steps to protect Plaintiff from the discrimination alleged herein.

67.     Despite Apple's knowledge of the discrimination alleged herein, and the actual knowledge of its agents, Apple allowed the discrimination of Plaintiff based on his age to continue and ultimately demoted him to Individual Contributor 6 from Director and failed to award merit-pay increases provided uniformly to other Apple employees in 2021 and 2022.

68.     As a proximate result of Defendants' unlawful acts, Plaintiff sustained a loss of earnings, fringe benefits, and/or promotions, and suffered emotional distress, humiliation, embarrassment, and the loss of enjoyment of life, manifested by feelings of depression, humiliation, embarrassment, anxiety, nervousness, and other symptoms of stress. Damage amounts are to be determined at trial.

69.     Plaintiff is entitled to damages, reasonable attorneys' fees and costs, and other appropriate relief as determined by this Court.

70.     In doing the acts alleged herein, Defendant acted maliciously and oppressively, with the wrongful intent of injuring Plaintiff, and acted with an improper and evil motive amounting to malice, in conscious disregard of Plaintiff's rights. Because the acts taken toward Plaintiff were

1    carried out by Defendant acting in a despicable, deliberate, and intentional manner, Plaintiff is

2    entitled to recover punitive damages in an amount according to proof at trial.

### THIRD CAUSE OF ACTION

### RETALIATION IN VIOLATION OF FEHA

5    71.    Plaintiff hereby re-alleges and incorporates herein by reference each and every

6    allegation contained in the previous paragraphs as though fully set forth herein.

7    72.    FEHA, prohibits "any employer. . . or person", inter alia, from retaliating against any

8    employee because he engaged in a protected activity. Filing a complaint, including an informal

9    complaint, qualifies as a protected activity. Cal. Gov. Code § 12940(h).

10    73.    By reporting discrimination based on age to Apple personnel in Cupertino, California,

11    Plaintiff engaged in protected activities under FEHA and was exercising or attempting to exercise his

12    rights.

13    74.    By bringing this lawsuit alleging discrimination based on age, Plaintiff engaged in

14    protected activities under FEHA and was exercising or attempting to exercise his rights.

15    75.    In violation of FEHA, the Company allowed Plaintiff to continue to be subjected to

16    discrimination based on his age, reduced his overall compensation, and demoted him in retaliation

17    for engaging in the protected activities set forth above, all without adequate and effective

18    communication or interaction.

19    76.    As a proximate result of Defendant's unlawful acts, Plaintiff sustained a loss of

20    earnings, benefits, bonuses, and/or promotions, and suffered emotional distress, humiliation,

21    embarrassment, and loss of enjoyment of life, manifested by feelings of humiliation, embarrassment,

22    anxiety, nervousness, and other symptoms of stress. Damage amounts are to be determined at trial.

23    77.    Plaintiff is entitled to damages, reasonable attorneys' fees and costs, and other

24    appropriate relief as determined by this Court.

25    78.    In doing the act alleged herein, Defendant acted maliciously and oppressively, with

26    the wrongful intent of injuring Plaintiff, and acted with an improper and evil motive amounting to

27    malice, in conscious disregard of Plaintiff's rights. Because the acts taken toward Plaintiff were

28

1  carried out by Defendant acting in a despicable, deliberate, and intentional manner, Plaintiff is

2  entitled to recover punitive damages in an amount according to proof at trial.

3  <center>FOURTH CAUSE OF ACTION</center>

4  <center>RETALIATION IN VIOLATION OF CALIFORNIA LABOR CODE</center>

5      79.   Plaintiff hereby re-alleges and incorporates herein by reference each and every

6  allegation contained in the previous paragraphs as though fully set forth herein.

7      80.   California Labor Code § 1102.5 prohibits an employer, or any person acting on behalf

8  of the employer from retaliating against an employee "because the employer believes that the

9  employee disclosed or may disclose information, to a government or law enforcement agency, . . . if

10  the employee has reasonable cause to believe that the information discloses a violation of state or

11  federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation,

12  regardless of whether disclosing the information is part of the employee's job duties." [Emphasis

13  added].

14      81.   During his time working for Apple, Mr. Shruhan, made complaints of Defendant's

15  allegedly illegal discrimination against him based on his age to Apple executives, HR, ER, and to his

16  immediate supervisors, all in Cupertino, California.

17      82.   On June 17, 2022, Plaintiff informed Apple of his intent to litigate his age

18  discrimination claims should they fail to reach a resolution. On September 22, 2022, Plaintiff

19  brought the instant lawsuit alleging discrimination based on age.

20      83.   In response to Plaintiff lodging such protected complaints, Defendant did nothing to

21  repair or mitigate these issues, instead, Defendant reduced his overall compensation and demoted

22  him in retaliation for such complaints. Accordingly, Defendant is in violation of Labor Code §§

23  1102.5, 6310, 6404, and Civil Code §§ 43 and 52.

24      84.   The above-referenced acts of named Defendant were done intentionally, and with

25  malice, and, therefore, entitles Plaintiff to an award of punitive and exemplary damages.

26      85.   In addition to the above, Plaintiff has and continues to incur legal fees, costs, and

27  other expenses in the prosecution of this matter.

28

1

**FIFTH CAUSE OF ACTION**

2

**BREACH OF CONTRACT**

3      86.      Plaintiff hereby re-alleges and incorporates herein by reference each and every

4      allegation contained in the previous paragraphs as though fully set forth herein.

5      87.      "A contract is an agreement to do or not to do a certain thing." Cal. Civ. Code § 1549

6      A contract is either express or implied. Implied in every contract is a duty of good faith and fair

7      dealing.

8      88.      Apple's Compensation Policies, including the Fiscal Year 2019 Manager

9      Compensation Guidelines and its RSU Adjustment Policy, governing RSU Refresh Grants are

10     developed and administered by Apple personnel in Cupertino, California. The Fiscal Year 2019

11     Manager Compensation Guidelines and its RSU Adjustment Policy were disseminated to employees

12     and were intended by Apple to inform workers of rules applicable to their employment. The specific

13     provisions of the Fiscal Year 2019 Manager Compensation Guidelines and its RSU Adjustment

14     Policy became an implicit part of the employment contracts of the Apple employees they covered,

15     including Plaintiff.

16     89.      Plaintiff has fulfilled his obligations and complied with any, and all, conditions and

17     agreements of the contract that he is required to perform by providing outstanding performance of

18     his employment obligations throughout his employment with Apple.

19     90.      When Apple personnel failed to make an RSU Refresh Grant consistent with its Fiscal

20     Year 2019 Manager Compensation Guidelines , Apple breached (1) the implied-in-fact contract

21     formed by its written policies, and (2) its duty of good faith and fair dealing in connection with its

22     written Employment Agreement with Plaintiff.

23     91.      In addition, each RSU Refresh Grant was a written offer that was accepted by

24     Plaintiff. Consideration for the RSU Refresh Grant was Plaintiff's continued employment at Apple.

25     Under this agreement, any recoupment of unvested RSU must be made pursuant to any recoupment

26

27

28

or clawback policies in effect at that time.[19] According to Apple, its RSU Adjustment Policy was a clawback policy in effect at the time that Apple purported to clawback Plaintiff's RSU Refresh Grant. Apple's claimed clawback of RSUs awarded to Plaintiff did not follow Apple's RSU Adjustment Policy, and was therefore in breach of the RSU Refresh Grant express written agreement. Plaintiff has fulfilled his obligations and complied with any and all conditions and agreements of the RSU Refresh Grant by providing outstanding performance of his employment obligations throughout his employment with Apple.

92.    Further, Plaintiff and Apple entered an agreement in 2019 for Plaintiff to return to the United States following the expiration of his expat agreement ("Repatriation Agreement"). The Repatriation Agreement stipulated that he shall remain at least a Director-level employee, be permitted to work from Arizona, and continue to receive a salary commensurate with his performance as a Director-level employee. Consideration for this Agreement was Plaintiff's continued employment at Apple. Apple demoted Plaintiff in spite of this agreement from a Director-level to an Individual Contributor-level employee despite no change in job duties or responsibilities. In anticipation of this demotion, which would be a breach of the agreement, Apple has denied Plaintiff yearly merit-pay increases that were granted to other U.S. Director-level employees. Apple's denial of yearly merit-pay increases caused Plaintiff's compensation to fall below the compensation of the standard U.S. director-level employee in 2021 and 2022, and are in breach of its agreement to maintain Plaintiff as a Director-level employee at a Director-level compensation.

93.    Plaintiff has fulfilled his obligations and complied with any, and all, conditions and agreements of the Repatriation Agreement by returning to the United States and providing outstanding performance of his employment obligations throughout his employment with Apple.

---

[19] Other conditions of recoupment, such as a compliance with a statute or regulation requiring recoupment, or a finding of fraud by the employee, do not apply here.

1

2

**SIXTH CAUSE OF ACTION**

**VIOLATIONS OF THE UNFAIR BUSINESS PRACTICES ACT**

3

4

94.     Plaintiff hereby re-alleges and incorporates herein by reference each and every allegation contained in the previous paragraphs as though fully set forth herein.

5

6

7

95.     The California Unfair Competition Law, California Business and Professions Code § 17200 *et seq.* ("UCL" or "B&P"), defines unfair competition to include any "unlawful," "unfair," or "fraudulent" business act or practice. Cal. Bus. & Prof. Code § 17200.

8

9

96.     Defendant's conduct, as alleged above constitutes unlawful, unfair and/or fraudulent business practices for the reasons set forth above.

10

11

12

13

97.     As a result of Defendant's unlawful, unfair and fraudulent conduct, Plaintiff suffered emotional distress, humiliation, embarrassment, and the loss of enjoyment of life, manifested by feelings of depression, humiliation, embarrassment, anxiety, nervousness, and other symptoms of stress.

14

15

98.     Pursuant to B&P § 17203, Plaintiff seeks declaratory and injunctive relief for Defendant's unlawful, unfair and fraudulent conduct and to recover restitution.

16

17

99.     Pursuant to Code of Civil Procedure § 1021.5, Plaintiffs and other aggrieved parties are entitled to recover reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

18

19

20

21

100.     Under B&P § 17203, Plaintiff seeks an order of this Court: (a) enjoining Defendant from continuing to engage, use, or employ any unlawful, unfair and/or deceptive business act or practice and any act prohibited by B&P § 17200 et seq.; and (b) restoring all monies that may have been acquired by Defendant as a result of such unlawful, unfair or deceptive acts or practices.

22

**PRAYER FOR RELIEF**

23

24

**WHEREFORE**, Plaintiff prays for judgment against Defendant, and each of them, as follows:

25

1.     For emotional distress damages in an amount to be proven at trial;

26

27

2.     For compensatory, economic, general, and special damages in amounts to be proven at trial;

28

3.   For punitive damages in an amount necessary to punish and make an example of Defendant;

4.   For the reasonable value of attorney services and fees, pursuant to applicable statutes, including, but not limited to, FEHA;

5.   For prejudgment interest;

6.   For an order of this Court: (a) enjoining Defendant from continuing to engage, use, or employ any unlawful, unfair and/or deceptive business act or practice and any act prohibited by B&P § 17200 *et seq.*; and (b) restoring all monies that may have been acquired by Defendant as a result of such unlawful, unfair or deceptive acts or practices;

7.   Under B&P § 17206, that Defendant Company be assessed a civil penalty in the amount of $2,500 for each violation of the UCL, according to proof;

8.   Under B&P § 17536, that Defendant Company be assessed a civil penalty in the amount of $2,500 for each violation of B&P § 17500, according to proof; and

9.   For such other and further relief as this Court deems just and proper.

1

## DEMAND FOR JURY TRIAL

2        Plaintiff Donald K. Shruhan, Jr. hereby demands a trial by jury on all claims.

3    DATED: October 23, 2023            Respectfully submitted,

4                                       HAGENS BERMAN SOBOL SHAPIRO LLP

5                                       By  */s/Jessica Thompson*
6                                          Jessica Thompson (*pro hac vice*)
                                        Stephanie Verdoia (*pro hac vice*)
7                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1301 Second Avenue, Suite 2000
8                                       Seattle, Washington 98101
                                        Telephone: (206) 268-9370
9                                       E-mail: jessicat@hbsslaw.com
10                                      E-mail: stephaniev@hbsslaw.com

11                                      Cecilia N. Brennan, Esq. (SBN 243954)
                                        HKM EMPLOYMENT ATTORNEYS LLP
12                                      401 West A Street, Suite 200 (#77)
                                        San Diego, California 92101
13                                      Tel/Fax: (619) 717-6410
                                        E-mail: cbrennan@hkm.com
14

15                                      *Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28